IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CRYSTAL GAIL MANGUM,           )
                               )
            Petitioner,        )
                               )
      v.                       )      1:16CV978
                               )
FRANK L. PERRY,                )
                               )
            Respondent.        )

ORDER AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

        Petitioner Crystal Gail Mangum, a prisoner of the State of North Carolina, filed a

document titled as a Motion for Appropriate Relief [Doc. #1].  Motions for Appropriate

Relief, although commonly and properly used in the courts of the State of North Carolina to

raise collateral challenges to criminal convictions, cannot be used for that purpose in this

Court.  Instead, collateral challenges to state court criminal convictions must be brought here

through a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254.  Rather than dismiss

the Motion for Appropriate Relief, the Court instead accepted the filing, treated it as a Petition

under § 2254, and allowed Petitioner to correct any deficiencies.  Petitioner then cured the

deficiencies by paying the filing fee and filing a Corrected Petition [Doc. #3] using the correct

forms.  The Court ordered Respondent to respond to the Petition, which resulted in him filing

a Motion for Summary Judgment [Doc. #10], to which Petitioner filed a Response [Doc. #15].

<u>Case History</u>

On the night of April 3, 2011, Petitioner and Reginald Daye, who lived together in Daye's apartment, became involved in a verbal disagreement which evolved into a physical altercation. Ultimately, Petitioner stabbed Daye in his left side with a knife. Daye was taken to Duke University Hospital, where surgery was performed on his wound. Daye survived the surgery and was conscious and able to talk to police for the next couple of days. However, on April 6, 2011, his condition worsened, further procedures were performed, and Daye became brain dead. He was removed from life support and died on April 13, 2011.

Based on Daye's death, Petitioner was charged with one count of first-degree murder. She was also charged with two counts of larceny based on $700 in cashier's checks that Daye had previously given Petitioner to hold and that Petitioner had taken with her to a friend's house following the stabbing. On November 22, 2013, following a jury trial in which Petitioner testified and raised self-defense as a defense to the murder charge, the jury convicted Petitioner of second-degree murder, but acquitted her of the larceny charges. She then received a sentence of 170 to 216 months of imprisonment for the murder conviction.

Petitioner's appellate attorney filed a direct appeal raising a single issue challenging the trial court's decision to allow the jury to hear evidence of a prior domestic incident involving Petitioner and another man with whom she had lived. The North Carolina Court of Appeals denied the appeal and Petitioner's attorney then filed a petition for discretionary review, which Petitioner withdrew in lieu of her own petition that the North Carolina Supreme Court later denied. <u>State v. Mangum</u>, 242 N.C. App. 202, 773 S.E. 2d 555, <u>rev. denied</u>, 368 N.C. 601, 780 S.E. 2d 264 (2015). While the appeal remained pending, Petitioner's friend and supporter,

Sidney Harr, filed a petition for a writ of habeas corpus in the North Carolina Court of Appeals, which that court denied. (State's Memorandum [Doc. #12] Ex. 14.) Harr also filed a petition for a writ of habeas corpus in the Superior Court of Durham County. After the summary denial of that petition, Petitioner filed a Motion for Appropriate Relief in the Superior Court of Durham County, which was also denied. (Id., Ex. 6 at 21 and Ex. 13.) She then filed the current action in this Court.

Claims

In Plaintiff's Corrected Petition and supporting Memorandum, Petitioner raises the following claims: 1) Dr. Clay Nichols, the State Medical Examiner who conducted Daye's autopsy and testified concerning his death, made errors during the autopsy and committed perjury while testifying; 2) the State introduced a fraudulent document by introducing Nichols's autopsy report; 3) the State withheld exculpatory evidence in the form of text messages sent by an unidentified person to Petitioner's first defense attorney concerning Daye's cause of death; 4) no credible witness appeared before the grand jury to seek the indictment against Petitioner, and the trial court did not rule on a motion by Petitioner to dismiss her indictment on this basis; 5) Petitioner was indicted for crimes that were never committed because Daye's death was caused by medical negligence rather than a stab wound and because Petitioner did not steal the cashier's checks from Daye; 6) Petitioner's first defense attorney procured an expert witness, Christena Roberts, to evaluate the report from Daye's autopsy, but the trial court did not require defense attorneys to share that report with her until her trial attorney allowed her to see it during the trial, too late for her and her supporters to properly assess it; 7) the trial judge ordered the State to produce a certain document from Dr.

Nichols's personnel file, but only allowed Petitioner's attorney, not her, to see the document; 8) the North Carolina Court of Appeals misstated certain facts in its decision on appeal; 9) Petitioner's trial attorney, Daniel Meier, provided ineffective assistance of counsel in multiple ways; 10) Petitioner received ineffective assistance on appeal; and 11) Petitioner's attorneys did not consult with her friend and supporter Sidney Harr in preparing and presenting her defense and did not call him as a witness. In addition to these claims, Petitioner also makes a number of allegations in an Addendum to her Memorandum. However, many of these additional allegations overlap with or are part of the claims just listed, or do not appear to be intended as separate claims for relief. However, to the extent necessary, the Court will briefly address the additional allegations in the Addendum, following a discussion of Petitioner's other claims.

<u>Exhaustion and Procedural Bar</u>

Respondent asserts as an initial matter that Petitioner's claims are not exhausted as required by 28 U.S.C. § 2254(b) because (1) Petitioner did not properly present the claims on direct appeal, (2) the state court habeas petitions were not a proper way to raise Petitioner's claims, and (3) Petitioner did not file a petition seeking a writ of certiorari with the North Carolina Court of Appeals to challenge the denial of her Motion for Appropriate Relief by the state trial court. In North Carolina, a petitioner may satisfy the exhaustion requirement of § 2254 by raising her claim(s) in a direct appeal of her conviction and/or sentence to the North Carolina Court of Appeals followed by a petition to the Supreme Court of North Carolina for discretionary review, or by raising her claims in a Motion for Appropriate Relief ("MAR") and petitioning the North Carolina Court of Appeals for a writ of certiorari if the MAR is denied.

See Lassiter v. Lewis, No. 5:11HC2082D, 2012 WL 1965434, at *4-5 (E.D.N.C. May 31, 2012) (unpublished) (citing O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999), and N.C. Gen. Stat. §§ 7A–31, 15A–1422). In this case, Petitioner did not raise her claims on direct appeal. She did raise some of her claims in her state court Motion for Appropriate Relief, but did not petition the North Carolina Court of Appeals for a writ of certiorari after her MAR was denied by the trial court. Thus, Petitioner failed to properly exhaust her claims in state court.

Moreover, Respondent also contends that for any claims that were not previously raised in the state courts, if Petitioner attempted to raise such claims now in state court, they would be barred under N.C. Gen. Stat. § 15A-1419(a)(1). That provision bars claims that Petitioner was in a position to make in a previous MAR but did not. In this case, the state MAR Court specifically held that Petitioner had set forth "no probable grounds for the relief requested, either in law or in fact," and further held that "petitioner's failure to assert any other grounds in his motion shall be subject to being treated in the future as BAR to any other claims, assertions, petition, or motions that he/she might hereafter file in this case." (See MAR Order [Doc. #3-1 at 4].) Thus, for any claim that was not raised in state court and is now procedurally defaulted, Petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000).

Without waiving these contentions regarding Petitioner's failure to exhaust and the procedural bar, Respondent has further addressed Petitioner's claims on the merits, and

contends that Petitioner's claims should be denied in any event. <u>See</u> 28 U.S.C. § 2254(b)(2). The Court therefore considers the contentions as to each claim below.

Standard of Review

With respect to matters "adjudicated on the merits in State court proceedings," this Court may not grant habeas relief unless the state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Clearly established Federal law" includes only "'holdings, as opposed to dicta,'" of the United States Supreme Court. <u>White v. Woodall</u>, 134 S. Ct. 1697, 1702 (2014) (quoting <u>Howes v. Fields</u>, 565 U.S. 499, 505 (2012)). A state court decision is "contrary to" United States Supreme Court precedent if the state court decision either "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confronts a set of facts that are materially indistinguishable from a decision of [the United States] Supreme Court and nevertheless arrives at a result different" from the United States Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 406 (2000). A state court decision involves an "unreasonable application" of Supreme Court case law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407; <u>see also</u> <u>id.</u> at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous"). "[A]n 'unreasonable application of' those holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." <u>White</u>, 134 S. Ct. at 1702 (citing <u>Lockyer v. Andrade</u>, 538 U.S.

63, 75–76 (2003)). "Rather, 'as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). This standard applies even if the state court does not provide any reasoning or explanation for its determination. See Harrington, 562 U.S. at 99-100. In addition, this Court must presume state court findings of fact correct unless clear and convincing evidence rebuts them. 28 U.S.C. § 2254(e)(1).[1]

### Facts

The basic facts of the case, as set out by the North Carolina Court of Appeals on direct appeal, are as follows:[2]

> Defendant and Reginald Daye ("Daye") met through mutual friends in January 2011. One month later, the two began living together along with defendant's three children. On 3 April 2011, defendant and Daye went to a party around 11:00 p.m. and returned to the apartment complex where they lived ("the apartment") approximately an hour and a half later. Durham Police Department ("DPD") Officer Curtis Knight ("Knight") was waiting for an illegally-parked vehicle to be towed from the apartment complex when defendant and Daye approached Knight's patrol car and asked what he was doing. Knight told them. Daye and defendant then entered the apartment, but a few minutes later they were back outside. Knight heard Daye yelling, "give me my money" at defendant, referring to $700 he had given defendant to hold for rent. After Knight told them that they could not be outside making so much noise, defendant and Daye went back inside the apartment.

---

[1] To the extent Petitioner has previously raised her various claims in the state courts, this Court will apply the standards set out above to these claims. To the extent that Petitioner attempts to assert any new claims that were not previously raised in state court, those claims would be subject to the procedural bar set out above.

[2] As noted above, in one of her claims for relief, Petitioner takes issue with some of these facts. Those issues will be discussed further in relation to that claim. The Court here simply recounts the facts as set out by the North Carolina Court of Appeals.

Daye's nephew, Carlos Wilson ("Wilson"), who lived in the same apartment complex, also heard the commotion and went outside where he encountered Knight. Wilson told Knight he would check on Daye; however, no one answered when Wilson knocked on defendant and Daye's apartment door. Wilson left and went to bed, but was awakened by a knock on his door at approximately 3:00 a.m. When he opened the door, Wilson found Daye standing there, shirtless, and bleeding from his left side. Daye told Wilson that defendant had stabbed him. Wilson then called 911 and attempted to provide medical aide until the paramedics arrived.

At approximately 3:20 a.m., DPD Officer Bradley Frey ("Frey") arrived at the apartment. Daye told Frey that he and defendant argued about money, the argument became hostile, and defendant stabbed Daye with a knife. As a result of a stab wound to the left side of his chest, approximately two to three inches deep, Daye sustained extensive injuries requiring emergency surgery. Daye died a few days later due to complications from the stab wound.

Several DPD officers investigated and found broken glass, multiple knives—both broken and intact—and bloodstains throughout the apartment. A serrated knife, five inches long with Daye's blood on the blade, was laying flat on the living room couch. Daye's blood was also found on the kitchen counter, the hallway carpet, and the ground and staircase railing outside the apartment. The door from the hallway to the bathroom had been broken off its hinges, and a clump of hair was found on the bathroom floor. Another clump of hair was found in the master bedroom.

DPD Officer C.N. Walker ("Officer Walker") was also dispatched to the apartment and, upon his arrival, he learned where defendant was located. Shortly thereafter, DPD Officer Charles Franklin and Officer Walker arrested defendant at the nearby home of Liddie Howard ("Howard"), a friend who was watching defendant's children at the time. When Officer Walker arrived at Howard's home, he did not observe any obvious injuries on defendant; but after arriving at police headquarters, defendant claimed "to hurt all over." Defendant had a scratch below her left eye, which was partially scabbed, and a lesion on the side of her lip.

On 18 April 2011, defendant was indicted for the first degree murder of Daye. From December 2011 to November 2013, defendant filed numerous pre-trial motions which included, inter alia, a motion in limine requesting that the trial court prohibit "the State from mentioning or eliciting from any witness any alleged acts of [defendant's] prior misconduct ... or any reference to defendant's past criminal conviction[s]." At the pre-trial motion hearing, the State informed the court that it intended to offer evidence pursuant to Rule 404(b) of the North

Carolina Rules of Evidence regarding an altercation that occurred between defendant and a man named Milton Walker ("Walker") in February 2010 ("the Walker incident"). Walker had known defendant since high school, and the two dated periodically before they began living together in a duplex ("the duplex") in early 2010. Defendant's trial counsel expressed concern about the Rule 404(b) evidence, and stated that, "at a minimum," the issue should be addressed at the appropriate time during trial. The trial court agreed, and asked that the prosecutor alert both the court and defendant prior to the introduction of any evidence sought to be admitted pursuant to Rule 404(b).

Defendant's trial proceeded in Durham County Superior Court on 12 November 2013 for the first degree murder charge and two charges of larceny of a chose in action. During trial, the State addressed the Rule 404(b) issue regarding the Walker incident to the trial court prior to calling any 404(b) witnesses. The trial court held a voir dire hearing on the evidence, during which the State summarized the facts of the Walker incident and sought to introduce the evidence pursuant to Rule 404(b) for the purposes of showing motive, opportunity, intent, absence of mistake or accident, plan, knowledge, and preparation. Defendant objected, but the trial court ultimately determined that a majority of the Rule 404(b) evidence was admissible and probative of motive, intent, and plan. As a result, multiple witnesses, including Walker, were permitted to testify regarding defendant's involvement in the Walker incident.

The State also presented evidence from DPD Lieutenant Marianne Bond ("Bond"). Prior to his death, Daye spoke with Bond twice regarding the events that transpired between himself and defendant. Bond testified to Daye's statement of the events. After returning from the party, Daye and defendant argued in the apartment's parking lot until a DPD officer approached and told them to calm down. Inside the apartment, defendant called a male—whom Daye believed to be a police officer—to come pick her up and stated that she had a date. Defendant and Daye argued about defendant bringing other men to the apartment. Daye also demanded that defendant return his $700. After more arguing, defendant entered the bathroom and locked the door. Believing defendant had called an unidentified police officer to pick her up, Daye kicked in the bathroom door, grabbed defendant by the hair, and pulled her into the master bedroom. At some point, defendant retrieved multiple knives from the kitchen and "came at him three or four times." As Daye attempted to protect himself, he received a cut on his hand. Daye was heading to the front door trying to leave the apartment when defendant stabbed him in the hallway.

Daye also told Bond that he grabbed defendant during their argument, but he did not recall punching her that night, and insisted that he had never punched her. However, defendant hit Daye four to five times, including once in the eye. Daye denied ever holding or throwing any knives during the altercation. In

response to Bond's question regarding multiple hair samples found in the apartment during the investigation, Daye admitted that he was probably the one that pulled out defendant's hair.

Defendant testified in her own defense, and gave a much different account. According to defendant, Daye had never before complained about defendant bringing other men to the apartment. However, on the night in question, Daye felt disrespected because defendant was talking to other men. During their argument, Daye suddenly hit defendant, causing her to fall down on the living room floor. The fighting spilled over to the master bedroom. At some point, Daye went to the kitchen, retrieved several knives, and began throwing them at defendant as she hid behind a mattress. After defendant locked herself in the bathroom, Daye kicked in the door and dragged her by the hair back to the master bedroom, where Daye pinned defendant against the floor, hitting and choking her. In response, defendant grabbed a knife off the floor, "poked" Daye in his side, exited the apartment, and ran to Howard's home.

Mangum, 242 N.C. App. 202, 203-205, 773 S.E. 2d 555, 558-559.

Discussion

Petitioner's first claim for relief argues that Dr. Clay Nichols, the State Medical Examiner who performed Daye's autopsy, committed perjury when he testified at Petitioner's trial that Daye's spleen was removed during the surgery to repair the knife wound inflicted by Petitioner. (Respondent's Brief [Doc. #12], Ex. 21, Trial Tr., Vol. 6 at 889-90, 896.) Petitioner contends that this testimony is inconsistent with the autopsy report prepared by Nichols, which shows that Daye's spleen was present at the autopsy and that Nichols weighed and examined the spleen during the autopsy. (Corrected Petition, Ex. D.) Petitioner also points to Daye's surgical records, which reflect surgical repair of the damage to Daye's spleen from the stab wound and do not note removal of the organ. (Id., Ex A-2.)

Under Giglio v. United States, 405 U.S. 150, 153-54 (1972), the State may not knowingly present false testimony or allow such testimony to go uncorrected. However, "[m]ere inconsistencies in testimony by government witnesses do not establish the

government's knowing use of false testimony." <u>United States v. Griley</u>, 814 F.2d 967, 971 (4th Cir. 1987). Further, Petitioner must establish that any false testimony was material by demonstrating that there was a reasonable likelihood that the false testimony could have affected the judgment of the jury. <u>Giglio</u>, 405 U.S. at 154. Here, Petitioner fails to establish either a knowing use of false testimony or materiality.

Petitioner points to no reason to conclude that Nichols gave intentional false testimony regarding the removal of Daye's spleen and no reason to conclude that the prosecution knowingly introduced such evidence. At trial, the State claimed only that Daye died from complications following surgery to repair the stab wound, not from the removal of his spleen or damage to that organ. Thus, the presence or absence of the spleen during the autopsy affected no critical aspect of the case. Further, Nichols's own report contradicted his testimony, and the State asked that the report be published to the jury. (Respondent's Brief, Ex. 21, Trial Tr., Vol. 6 at 893-94.) There is no reason to believe that a witness would knowingly give false testimony contradicted by his own report or that the State would present testimony it knew to be false only to then ask that the jury be given a contradictory report. The testimony regarding Daye's spleen was at most a mistake and not intentional false testimony as Petitioner contends. Further, as just stated, the State did not contend that damage to Daye's spleen was the cause of his death. Notably, even if Nichols had testified consistent with his report that Daye's spleen was present during the autopsy, the verdict would have been unaffected. The challenged testimony was not material because there was no reasonable likelihood it affected the judgment of the jury. <u>See</u> <u>United States v. Kallen-Zury</u>, 629 F. App'x 894, 899 (11th Cir. 2015) (finding no due process violation where the allegedly false testimony

was actually accidental error, the defendant possessed information from which to discover the error on her own, and the testimony was not material to the defendant's case). Thus, Petitioner has failed to establish any intentionally or knowingly false testimony, has failed to establish that the alleged false testimony was material to the determination in this case, and even more importantly, has failed to establish that the state court rejection of this claim was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts. Petitioner's first claim for relief should be denied.

Petitioner's second claim for relief argues that the State introduced a fraudulent document when it introduced the autopsy report into evidence. Specifically, Petitioner points to various alleged deficiencies in the autopsy report, contending that the autopsy report conflicted with Daye's medical records in certain respects and also contending that the autopsy report failed to include proper photographic documentation. Petitioner further contends that the autopsy report is fraudulent because it reached what Petitioner believes is an incorrect conclusion that Daye died from "[c]omplications of [a] stab wound to [the] chest." (Id., Ex. G.) Specifically, Petitioner contends that Daye actually died not from any connection to the stab wound she inflicted, but because of an errant intubation into his esophagus, rather than his trachea, while hospital staff treated him in the days after the stabbing.

However, Plaintiff has not shown any basis to conclude that the autopsy report was intentionally false or fraudulent. The autopsy report contains Nichols's opinion as a medical examiner regarding Daye's cause of death, and there is no evidence to suggest that Nichols did not believe that opinion to be true and correct. With respect to the alleged inconsistencies

or deficiencies in the autopsy reports, Petitioner's trial counsel cross-examined Nichols regarding those issues at trial. For example, Petitioner contends that the autopsy report noted a perforation in Daye's left lung, stomach, and left kidney that were not reflected in Daye's operative report. Petitioner's trial counsel questioned Nichols regarding these issues at trial, and Nichols testified regarding his findings, including evidence of a stab wound to the lung, stomach, and left kidney. (Respondent's Brief, Ex. 18, Trial Tr., Vol. 6 at 896-902.) Similarly, Petitioner contends that that the five photographs taken by Nichols during the autopsy were insufficient. Petitioner's trial counsel also raised this issue at trial during cross-examination of Nichols. (Id.) None of these contentions would support the conclusion that the autopsy report was intentionally false or fraudulent.

Moreover, Petitioner's exhibits submitted in the state courts include an expert report by Dr. Christena Roberts, the potential expert witness hired by the defense. Dr. Roberts noticed many of the possible issues on which Petitioner now relies, but ultimately agreed with Nichols's conclusion, stating that "the Cause of Death is Complication of a Stab Wound to the Chest." (Respondent's Brief, Ex. 13 at 20.) Specifically, Petitioner's own expert concluded as follows:

> Mr. Daye died as a result of a chain of events that began with a stab wound to the chest and therefore I agree that the Cause of Death is Complication of a Stab Wound to the Chest. The mechanism of his death was a known complication to a procedure, specifically, aspiration following emesis after placement of a nasogastric tube for contrast administration. The initial intubation was esophageal because the emesis was blocking view of the vocal cords. Two (2) subsequent intubations were shown to be in the airway. This event was followed by cardiopulmonary arrest with anoxic brain injury.

(Id.)

Thus, Petitioner's contentions regarding the cause of death reflect only disagreement with the autopsy report, and those contentions are not even supported by Petitioner's own expert. More importantly at this stage, Petitioner has failed to present any basis to conclude that Nichols's autopsy report was intentionally false or that the prosecutor knowingly used false evidence. Finally, Petitioner has failed to establish that the state MAR court's rejection of this claim was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts. This claim should also be denied.

Petitioner's third claim for relief is that the State withheld or ignored exculpatory evidence in the form of text messages sent from an unidentified person to Petitioner's first defense attorney. In those messages, the person stated that he or she knew Mangum and Daye, that another unidentified person working at Duke University Hospital saw records about a complication with a procedure related to something going wrong with a tube, and that the Hospital was keeping things quiet because Daye did not die of a knife wound.

Brady v. Maryland, 373 U.S. 83 (1963), and its progeny hold that the failure by the prosecution to disclose to the defense "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Kyles v. Whitley, 514 U.S. 419, 431 (1995). However, there can be no Brady violation based on the claim raised here because Petitioner's own allegation is that the messages were sent to her defense attorney. Therefore, the defense was aware of the messages and the prosecution could not possibly have withheld or suppressed the evidence. In Petitioner's Response brief, she makes it clear that her true claim is that her

defense attorneys did not explore the messages further or present this evidence to the jury. That contention will be discussed further below in relation to Petitioner's claims of ineffective assistance of counsel. However, to the extent she claims that the prosecution somehow withheld or suppressed this evidence, this claim fails and should be denied.

Petitioner's fourth claim is that no credible witness appeared before the grand jury to seek the indictments rendered against Petitioner. Petitioner also contends that the state trial court improperly failed to rule on a motion raising this issue. However, Petitioner does not point to any federal right supporting these claims, but instead cites N.C. Gen. Stat. § 15A-995(3), which allows a trial court discretion to dismiss an indictment in North Carolina if all of the witnesses testifying before the grand jury were incompetent. State law errors do not give rise to federal habeas claims absent a specific constitutional violation or fundamental unfairness. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Grundler v. North Carolina, 283 F.2d 798, 802 (4th Cir. 1960). Here, Petitioner points to no such constitutional violation. She has not even demonstrated an error under state law. In her initial filings with this Court, Petitioner claimed that only Durham Police Officer Marianne Bond testified before the grand jury and that she was incompetent to testify as to the cause of Daye's death because she lacked medical or forensic training. As the State correctly points out in its brief, such training was not required to render Bond competent to testify concerning the cause of Daye's death because, under N.C. Gen. Stat. § 8C-1, Rule 1101(b)(2), the North Carolina Rules of Evidence, other than rules covering privileges, do not apply in grand jury proceedings. This means that Bond was allowed to relate to the grand jury the conclusion in Nichols's autopsy report, produced four days before Bond testified, that complications related to the stab wound

inflicted by Petitioner caused Daye's death. In response to this, Petitioner argues that "complications of a stab wound to the chest" is too ambiguous to properly identify a cause of death and that Nichols should have been more specific in his report. However, this is an attack on the strength of the evidence presented to the grand jury, not Bond's competence to testify concerning the contents of the report. With respect to Petitioner's contention that the trial court failed to rule on her motion to dismiss, she again does not rely on any specific federal right. Moreover, the record reflects that the trial court specifically instructed Petitioner that all pending motions filed by prior counsel and by Petitioner *pro se* would not be considered unless specifically raised and brought to the court's attention by trial counsel, and Petitioner's trial counsel did not raise the prior motion to dismiss for determination by the court. (Tr. of Pre-Trial Motion Hearing at 36; Tr. of Trial at 20.) Indeed, there was no basis for trial counsel to pursue the motion to dismiss because, as noted above, Officer Bond was competent to testify before the grand jury. Thus, Petitioner's claims related to Bond's competence to testify in front of the grand jury should be denied.

Petitioner's next claim is that she was indicted for crimes that never occurred because Daye's death was caused by medical negligence, not the stab wound inflicted by Petitioner, and because she did not steal checks from Daye.

Turning first to the larceny charges, in order to seek habeas relief, a petitioner must be in state custody on the challenged conviction or sentence. 28 U.S.C. § 2254(a). If a petitioner is not in state custody, the Court does not have subject matter jurisdiction over her petition. Maleng v. Cook, 490 U.S. 488, 492 (1989). Petitioner's acquittal on the larceny charges means that she is not in custody for those charges and cannot bring a habeas claim challenging them.

As for the cause of Daye's death, that is not a question for this Court, but was a question for the jury in Petitioner's trial. The jury determined in convicting Petitioner that her actions did cause Daye's death. Any challenge to that finding at this point would have to be brought as a claim challenging the sufficiency of the evidence. In a habeas corpus action, the standard of review for a claim of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in the original). A court reviewing the sufficiency of the evidence "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." <u>United States v. Tresvant</u>, 677 F.2d 1018, 1021 (4th Cir. 1982). It has further been held that "circumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent with innocence." <u>United States v. George</u>, 568 F.2d 1064, 1069 (4th Cir. 1978). The standard is obviously rigorous, however, as the Supreme Court has reiterated, "the writ of habeas corpus has historically been regarded as an extraordinary remedy." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 633 (1993).

Here, the State presented Nichols's testimony and autopsy report as evidence supporting the conclusion that Petitioner's stabbing of Daye was the ultimate cause of his death. Petitioner criticizes that testimony and the report and points to what she believes are errors and deficiencies with the conclusion that Daye died from complications related to the stab wound. However, in reviewing for sufficiency of the evidence, all reasonable inferences are drawn in favor of the State. Here, there is no question that a rational trier of fact could

have relied on Nichols's testimony and the autopsy report to conclude that the stab wound inflicted by Petitioner was the cause of Daye's death. Thus, to the extent that Petitioner intends to challenge the sufficiency of the evidence, her claim fails and should be denied.

The next two claims raised by Petitioner involve her access to certain documents. Petitioner first contends that her attorneys did not provide her with a copy of Dr. Roberts's expert report concerning the autopsy and Daye's cause of death until the second week of her trial. Petitioner contends that at a hearing in August 2013, she asked the court to require counsel to provide her with a copy of Dr. Roberts's report, but that the court instead left that for her to resolve with her attorney. However, Petitioner has not pointed to any constitutional violation related to these contentions. Moreover, the record reflects that Dr. Roberts did not initially prepare a report. At trial, Petitioner's trial counsel told the court that for strategic reasons, the defense had decided not to ask Roberts to prepare a report and did not intend to call her as a witness.[3] The Court inquired of Petitioner, and Petitioner stated that she wished to receive a report from Dr. Roberts, against the advice of counsel. (Respondent's Brief, Ex. 18, Trial Tr. Vol. 3 at 461-65.) A report was therefore prepared and provided to her, and Petitioner ultimately agreed not to call Roberts as a witness. (Id., Ex. 22, Trial Tr., Vol. 7 at 1068-69, 1107-08.) Petitioner now states that she might have altered her defense strategy to attack Daye's cause of death if she had received the report earlier, but this ignores the fact that, as stated above, the report ultimately agreed with Nichols's conclusion that Daye died from complications connected to the stab wound inflicted by Petitioner. Putting Roberts on

---

[3] In other filings included in the record, Petitioner notes that early in the case her attorney arranged for her to meet with Roberts in person to discuss Roberts's findings and answer Petitioner's questions. According to Petitioner, "[a]t this meeting, Petitioner received nothing in writing as the forensic pathologist tried to convince Petitioner that she was responsible for Daye's death secondary to the stabbing." (Pet. for Disc. Rev. at 4.)

the stand or introducing the report in any way would have simply highlighted to the jury that two experts had looked at the question and both concluded that Daye died as a result of the stab wound. Thus, Petitioner has failed to establish any basis for habeas relief, and this claim should be denied.

In her next claim, Petitioner faults the trial judge for not providing her personally with a copy of a document from Nichols's personnel file. However, the document was a personnel record that was considered a confidential document protected under state law. Therefore, the judge conducted an *in camera* review of the personnel file and allowed the document to be released for attorneys' eyes only. In her Petition, Petitioner fails to demonstrate a right to personally inspect or possess this document. "'There is no general constitutional right to discovery in a criminal case, and <u>Brady</u>,' which addressed only exculpatory evidence, 'did not create one.'" <u>Gray v. Netherland</u>, 518 U.S. 152, 168 (1996) (quoting <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977)); <u>see also</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987). Here, Petitioner's trial counsel received the document in question and concluded that there was no need to pursue the matter further.[4] Based on the information presented, Petitioner has not shown any violation of her constitutional rights. Moreover, this claim was raised in, and rejected by, the state court, and Petitioner has failed to establish that the state court rejection of this claim was contrary to, or involved an unreasonable application of clearly established

---

[4] In a later Motion, Petitioner submitted a copy of a letter she received in 2017 from North Carolina Prisoner Legal Services regarding the documents from Nichols's personnel file. In the letter, NCPLS noted that according to Petitioner's trial counsel, the document from Nichols's personnel file "was not as much about your case as about Dr. Nichols's conduct in a different case." NCPLS noted that personnel records are not public documents and that the approach taken by the trial judge was not unusual. Ultimately, NCPLS advised Petitioner that there was no legal basis to obtain a copy of the document. (Mot. To Compel [Doc. #18] Ex. E-1.)

Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts. This claim should therefore be denied.

Petitioner's next claim for relief is that the North Carolina Court of Appeals misstated certain facts on appeal. However, this Court does not sit as an appellate court reviewing the decisions of the North Carolina Court of Appeals for factual accuracy. Nor can a successful habeas claim be based simply on alleged misstatements in an appellate opinion. Petitioner must show a violation of some federally protected right, but she points to none. Further, there could not have been any possible harm to Petitioner. The only issue raised on direct appeal concerned the admission of certain evidence related to a prior altercation between Petitioner and a man with whom she previously lived. Petitioner does not raise any claims related to that issue in the present Petition. During her direct appeal, Petitioner withdrew the petition for discretionary review seeking to continue the appeal of that claim in lieu of her own filing. Therefore, she voluntarily ended the appeal of the claim. In no way could alleged misstatements by the North Carolina Court of Appeals have prejudiced her, and there is simply no basis for habeas relief based on these contentions.

Petitioner's next claim alleges ineffective assistance on the part of her trial counsel, Daniel Meier, in several respects. In order to prove ineffective assistance of counsel, a petitioner must establish, first, that her attorney's performance fell below a reasonable standard for defense attorneys and, second, that she suffered prejudice as result. See Strickland v. Washington, 466 U.S. 668 (1984). With respect to the first prong of Strickland, a petitioner bears the burden of affirmatively showing deficient performance. See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). With respect to the second prong of Strickland, to establish

prejudice, a petitioner must show the existence of a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have differed. <u>Strickland</u>, 466 U.S. at 694.

Petitioner's first allegation of ineffective assistance of counsel is that Meier failed to file a motion to continue her case so that he had adequate time to prepare for trial. Petitioner states that Meier had only two and one half months to prepare. However, Petitioner does not identify anything for which Meier needed more time to prepare, anything he failed to do due to a lack of time, or any prejudice to her case based on the alleged lack of time. Therefore, her claim is entirely conclusory and fails as such.

Similarly, Petitioner asserts that Meier failed to conduct an adequate pretrial investigation. However, she again provides no specifics regarding what he should have investigated. In her Response, she argues that he should have interviewed "Alonzo Breden, the DAYE apartment next door neighbor whose girlfriend and State witness Aykia Hanes testified [that she] saw Daye run down the stairs after being stabbed and then saw MANGUM come to the door, [and] say to [Breden] before slamming the door shut, 'Everything's all right.'" (Response [Doc. #15] at 17-18.) Petitioner provides no statement from Breden and no evidence suggesting that he would have contradicted Hanes's testimony in any way, much less in a material way, had he been interviewed. Therefore, she cannot demonstrate prejudice as to this claim.

Petitioner also faults Meier for not attempting to identify the author of the series of text messages to her first defense attorney in which the author stated that he or she heard that

an intubation mistake caused Daye's death and that Duke University Hospital was trying to keep it quiet. Those texts, when combined, read:

> Hey W...not contactin u on my case but I know Crystal and the guy passed away yesterday-- there's supposed 2b something n the med records where Duke did something wrong with a tube and nothing related to the knife injury?? Someone that works at Duke saw the records about the complication from the procedure and a close friend of Crstal's said he was "gone" and a deputy approached me yesterday and said "I understand there's been a change in the other person's status" and he was actually cordial and irrational about possible outcomes...I thought he was referring to the coma from the blood clot then later a lady told me he was gone and Duke was keeping it quiet bc it wasn't due.

(Corrected Petition, Ex. O.) An unknown person added the words "to knife wound" in handwriting to the end of the typed text in the last message. Reviewing the messages, it is apparent that the author had no actual firsthand knowledge of Daye's treatment or cause of death. All of the information on those points is based on comments made by other unidentified persons. Speculative text messages regarding rumored information, even with the author identified, would not have been admissible, and neither would the lay opinions of various workers who viewed the records. Further, according to the text messages, the information showing that Daye died of something other than the stab wound is supposedly contained in Daye's medical records. Those records were available to the defense and its potential expert witness Dr. Roberts, who examined them as part of her report before concluding that Daye died from complications related to the stab wound. The fact that unknown hospital workers may have had a different personal opinion after seeing the records would not have been admissible to aid Petitioner's defense. There is absolutely no indication that these persons were forensic pathologists or otherwise trained to render an expert opinion. Nichols and Roberts, the two expert witnesses who reviewed the records, reached the same

conclusion--Daye died from complications related to the treatment of the stab wound. This remains true whether or not there was a mistake involving an intubation that occurred during the course of that treatment and whether or not Duke University Hospital wished that mistake to be publicized. There is no indication that identifying the author of the text messages would have led to contrary information which would have aided Petitioner's defense.

In her next claim of ineffective assistance, Petitioner faults Meier for limiting her defense to only a strategy of self-defense and not contesting the cause of Daye's death. However, it is not entirely clear what Plaintiff contends that Meier should have done to raise a question as to Daye's cause of death. Regarding cause of death, the trial court instructed the jury:

> [T]he state must prove that the defendant's act was a proximate cause of the victim's death. A proximate cause is a real cause, a cause, without which, the victim's death would not have occurred. The act of the accused need not be the immediate cause of death. A defendant is legally accountable if the direct cause of death is a natural result of the criminal act. Neither medically negligent treatment nor neglect of an injury will excuse a wrongdoer, unless the treatment or neglect was the sole cause of death. In other words, the act complained of does not have to be the sole proximate cause of death nor the last act in a sequence of time. It is enough if the defendant's unlawful act joined and concurred with other causes in producing the result.

(Respondent's Brief, Ex. 23, Trial Tr. Vol. 8 at 1218.) Thus, Petitioner's attorney would have needed admissible evidence demonstrating not just that events other than the stab wound led to Daye's death, but that the other events were the sole cause of his death. See State v. Broom, 225 N.C. App. 137, 143 736 S.E.2d 802, 807-08 (2013) (finding evidence supported a murder conviction where a gunshot wound to a pregnant woman required an emergency delivery, the delivery led to a complicating condition in the infant, and the infant died); State v. Jones, 290 N.C. 292, 298-99, 225 S.E. 2d 549, 552 (1976) (finding that evidence supported a murder

indictment where a gunshot caused an infection which led to the administration of medication to which the victim had a fatal reaction). Nichols and the autopsy report do not provide evidence of another cause of death for Daye. Neither would Dr. Roberts and her report, given its ultimate conclusion on Daye's cause of death.

Petitioner's proffered solution for this problem would be testimony from her friend and supporter, Sidney Harr. However, this proposed strategy fails as a viable option for several reasons. First, nothing in the record indicates that Harr could take the stand as a lay witness. Although he is Petitioner's friend, nothing in the record indicates that he knew Daye, treated Daye, or had direct knowledge of the events surrounding Daye's stabbing or death. Therefore, to take the stand, he would have had to qualify as an expert witness who had sufficient training and experience to give an opinion concerning the cause of Daye's death. Petitioner states that Harr is a "retired emergency medicine physician." (Corrected Petition, Memorandum at 16.) Thus, it is possible that he could have been qualified as an expert witness to give opinions regarding matters related to emergency medical treatment. However, Petitioner has not attempted to establish that Harr had training or experience to qualify as an expert witness who could give an opinion as to Daye's cause of death. Moreover, having Harr give an opinion that Daye died following an incorrect intubation would not have helped Petitioner if treatment of the stab wound she inflicted led to the intubation. Petitioner theorizes in her pleadings that treatment of Daye for delirium tremens related to alcohol withdrawal actually led to his intubation. However, even if that were true, Petitioner has not shown that this would break the chain of causation, given that Daye apparently began suffering alcohol withdrawal because he was confined to the hospital and recovering from surgery all as

a result of the stab would. Moreover, Dr. Roberts's report reflects that in the hours before the intubation, Daye was assessed with "Systemic Inflammatory Response Syndrome (SIRS) basically response to a non-specific infection" and "Acute Respiratory Distress – aspiration event/pneumonia/PE (pulmonary embolism)." (Respondent's Brief, Ex. 13, at 15.) According to Dr. Roberts's report, a CT scan was ordered in connection with the Acute Respiratory Distress, and the CT scan required placement of a nasogastric tube to give contrast fluid.[5] Vomiting and aspiration then occurred, followed by a drop in Daye's oxygen saturation levels. (Id.) This led to his intubation. (Id.) Dr. Roberts therefore concluded that Daye's death was caused by a complication of a stab wound to the chest. Thus, Petitioner has produced nothing that supports the conclusion that Daye did not die from complications during the course of treatment related to the stab wound.

In contrast to the lack of evidence to support a challenge to the cause of death, admissible evidence existed to support Petitioner's theory of self-defense. Petitioner is articulate and educated, with military experience and a college degree in psychology. She was willing to, and did, take the stand in her own defense. In addition, some of the State's witnesses testified to a history of arguing and violence between Petitioner and Daye and to the fact that they were arguing on the night of the stabbing. (Respondent's Brief, Ex. 21, Trial Tr., Vol. 5 at 812; Id., at 857-59.) Significantly, as noted by the North Carolina Court of Appeals, Daye himself admitted to police that he and Petitioner fought, that he was angry with her because she was seeing other men, that he kicked in the bathroom door in their apartment after she

---

[5] At trial, Nichols testified that it would have been "standard protocol" to perform a CT scan to "check for infections and places that may have come undone or been missed." (Respondent's Brief, Ex. 18, Trial Tr., Vol. 6 at 903.)

locked herself in the bathroom, and that he grabbed and dragged Petitioner out by her hair and into a bedroom. Finally, the defense called Liddie Howard, who described Petitioner as "screaming and terrified" shortly after the incident. (Id., Ex. 22, Trial Tr., Vol. 7 at 1129.) Based on all of this evidence, a viable argument for self-defense existed. Petitioner's trial counsel therefore chose to focus on raising self-defense. Although it is tempting to second-guess such decisions where a conviction results, the Court must not do so in assessing claims of ineffective assistance of counsel. Harrington v. Richter, 562 U.S. 86, 105 (2011). Counsel's decision was not an unreasonable one in light of the record in the case. Therefore, he did not provide ineffective assistance of counsel regarding the decision not to otherwise challenge Daye's cause of death, and instead to focus on a self-defense strategy.

Petitioner next argues that her attorney provided ineffective assistance by allowing three jurors with ties to Duke University Hospital to remain on the jury, not providing her with a copy of Roberts's report until the last few days of the trial, and not challenging Nichols's statement that Daye's spleen had been removed prior to the autopsy. However, as to each of these contentions, Petitioner has not shown that counsel's performance was deficient or that the results of the proceeding would have been different. Petitioner contends that trial counsel should have challenged jurors with ties to Duke University Hospital, apparently based on Petitioner's contention that Daye's death was caused by alleged medical negligence of the hospital rather than the stab wound. However, as discussed above, even if Petitioner had established negligence by the hospital, that would not have affected the ultimate determination as to the cause of death, and Petitioner has not pointed to any admissible evidence to show that Daye's death was not a result of complications related to his treatment for the stab wound.

Therefore, there was no reason to challenge the jurors with ties to Duke University Hospital and no prejudice in failing to do so. With respect to Dr. Roberts's report, as noted above, that report was not prepared until trial, and the report ultimately agreed with the conclusions reached by Nichols. During pre-trial preparation, defense counsel made a strategic decision not to have a written report prepared. This was a reasonable decision in light of the conclusions that Dr. Roberts reached. After Petitioner insisted on preparation of a written report, the report was prepared and provided to Petitioner, but that report did not provide a viable defense. Thus, Petitioner did not suffer any prejudice in the decision not to prepare or provide the report earlier. Finally, as noted above, Nichols's testimony regarding removal of Daye's spleen was not material, and counsel's failure to challenge that testimony does not show insufficient performance, nor is there any showing of prejudice to Petitioner. Therefore, these allegations cannot establish either insufficient performance by counsel or prejudice to Petitioner.

Next, Petitioner faults counsel for not challenging the continued service of a juror who told other jurors to consider the reputation of the City of Durham in deciding the case. Early in the trial, an alternate juror reported that, shortly after the jury was selected, one juror "kind of took charge" and gave a rambling speech about Durham's image and representing Durham properly. (Respondent's Brief, Ex. 18, Trial Tr., Vol. 3 at 557.) When questioned by the trial judge, the alternate juror expressed uncertainty about whether the juror who spoke was advocating any particular result in the case or only admonishing the jury to do a good job with the case in order to represent Durham well. (Id. at 557-58.) After a bench conference, the trial judge announced on the record that he intended to 1) individually question each juror to

confirm that they understood the rules for the trial generally and the rule concerning premature deliberations specifically, 2) inquire as to whether anything had occurred in the jury room that would cause a juror not to be able to fulfill their duty based on the evidence, law, and instructions of the court, and 3) encourage each juror to bring any rules violations to the court's attention. (Id. at 559-60.) He concluded that nothing on the record at that point amounted to a specific violation of his instructions, but he wanted to avoid any later problems. The judge then did as he proposed and spoke to each juror accordingly. No juror reported any further problems or difficulties and the case continued without further incident. (Id. at 560-587.) Given this record, it is not clear what grounds Petitioner's attorney would have had for removing the juror who allegedly spoke about protecting Durham's reputation, as the trial judge found that no specific violation of his instruction occurred. Further, given that the juror was not alleged to have argued for a specific result in the case when making his comments to the jury and that the trial judge gave further individual instructions to each juror, there is no evidence of prejudice to Petitioner due to the comments. She cannot establish either deficient performance by counsel or any prejudice regarding the issue with the juror.

Finally, Petitioner faults her attorney for "[i]neffective, irrelevant, and tepid cross-examination" of the State's witnesses, particularly Nichols. (Corrected Petition, Memorandum at 15.) However, she fails to identify any specific instances of deficient performance regarding the cross-examinations, much less show any prejudice. Beyond issues with Nichols's testimony already discussed, which do not aid Petitioner for reasons already stated, this claim is entirely conclusory and should be denied as such.

Petitioner's next claim is that her appellate attorney also provided ineffective assistance. Such claims are also judged using the Strickland test set out previously. See Lawrence v. Branker, 517 F.3d 700, 708-09 (4th Cir. 2008). Appellate counsel need not raise on appeal every non-frivolous issue requested by a defendant. Jones v. Barnes, 463 U.S. 745 (1983); see also Smith v. Murray, 477 U.S. 527 (1986); Evans v. Thompson, 881 F.2d 117, 124 (4th Cir. 1989) (declaring that counsel pursued sound strategy when he "determined what he believed to be petitioner's most viable arguments and raised them on appeal"). Winnowing out weaker arguments to press forward with more important points is part of effective appellate advocacy. Jones, 463 U.S. at 751-52. Prejudice can be shown by demonstrating that "'counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.'" Bell v. Jarvis, 236 F.3d 149, 180 (4th Cir. 2000) (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)).

Petitioner contends that appellate counsel failed her by not sufficiently discussing the issues to pursue on appeal and by appealing only a single issue. Here, Petitioner points to no specific issues which appellate counsel should have raised. To the extent that she believes counsel erred in failing to raise any of the issues discussed above, those issues would not have succeeded for the reasons discussed, and counsel did not provide ineffective assistance by choosing not to pursue them. Counsel chose to focus on the most important legal claim related to Petitioner's assertion of self-defense, which was the most viable defense. This was a reasonable decision. Thus, Petitioner has failed to show ineffective assistance of counsel, and this claim should also be denied.

Finally, as her last clear claim, Petitioner contends that her rights were violated because her attorneys did not call Sidney Harr as a witness and did not properly consult with him during the trial preparations and trial. Petitioner's attorney had a duty to consult with Petitioner concerning her defense, not with her friends or supporters. As for the decision not to call Harr as a witness, the reasons for that decision are discussed in detail above. Counsel did not provide ineffective assistance of counsel by failing to call Harr to the stand.

Following the Memorandum in support of the Corrected Petition and attached exhibits, Petitioner attaches an Addendum stating that she deserves relief based on a list of forty-one "misdeeds, malfeasances, and irregularities." Most of this list consists of reiterations of claims or parts of claim already discussed. Petitioner also addresses ancillary matters, noting that Petitioner refused a favorable plea deal to go to trial and complaining that state judges and other authorities have not responded to her complaints as she believes they should. She also faults the media for reporting her case in a bad light. These statements do not appear to raise new or separate claims for relief for this Court. Petitioner also includes in that list allegations related to her post-conviction proceedings in the state courts, including a claim that North Carolina Prisoner Legal Services was ineffective in helping her. Errors in the state post-conviction process are not cognizable on habeas review in this court. Lawrence v. Branker, 517 F.3d 700, 717 (4th Cir. 2008). In addition, because there is no right to an attorney in state post-conviction proceedings, Petitioner cannot base a claim on actions by Prisoner Legal Services. Coleman v. Thompson, 501 U.S. 722, 752 (1991).

Petitioner also makes several complaints about this Court's filing and treatment of her Motion for Appropriate Relief in this Court. First, she states that Court staff attempted to

persuade Harr to file the Motion for Appropriate Relief in state court in Durham.  If this occurred, it is likely because the document was titled as a Motion for Appropriate Relief, a document proper for filing in the courts of North Carolina, but not one recognized in this Court.  In any event, it made no difference because Harr persisted in filing the document here. Petitioner also faults the Court's staff for refusing to accept the document from Harr, causing him to have to pay someone "off the street" to file the document.  This was apparently caused by a filing injunction entered against Harr in one of his cases pending in this Court against Duke University, <u>Harr v. Brodhead</u>, No. 1:16CV304 (M.D.N.C.)  Whether or not Petitioner's filing fell under that injunction, Court staff may have reasonably believed that it did.  In any event, the document was ultimately filed and Petitioner was not prejudiced in any way. Petitioner also complains about the treatment of her filing as a Petition under § 2254 and writings on the time and date stamp of the document intended to make the stamp clearer.  As explained earlier, Petitioner's initial filing was not a proper filing to seek relief in this Court. The Court's decision to treat the filing as a § 2254 petition while allowing Petitioner to remedy any deficiencies actually aided Petitioner, rather than harming her.  The alternative would have been to dismiss the document, thereby creating a potential statute of limitations issue. Similarly, nothing related to writings on the time and date stamp remotely harmed Petitioner. She cannot raise or succeed on any claim related to these allegations.

In summary, although Petitioner's claims are unexhausted and some are procedurally barred, none of her claims have merit.  Consequently, to the extent that the claims were raised in the state courts, the state court decisions denying those claims were not contrary to United States Supreme Court precedent and they did not involve unreasonable interpretations of that

precedent. Therefore, relief should not be granted to Petitioner under § 2254, and all of her claims should be denied.

In addition to the claims and filings discussed above, there are also three other motions pending in the case. The first is a Motion [Doc. #16] seeking Petitioner's release on house arrest pending resolution of this case. Clearly, no such release is appropriate given the entry of this Order and Recommendation recommending that her claims be denied. The Court will deny this Motion. Petitioner's second pending Motion [Doc. #17] seeks to compel the North Carolina State Bar to rule on a grievance Petitioner filed against her state appellate attorney. This Court does not control the North Carolina State Bar's grievance proceedings. Therefore, this Motion will also be denied.

Finally, Petitioner filed a Motion [Doc. #18] seeking discovery, specifically requesting that she be provided with a copy of the document from Nichols's personnel file which was designated for attorney's eyes only by the state courts. Rule 6 of the Rules Governing Section 2254 Proceedings authorizes discovery in post-conviction proceedings, but not as a matter of course. This authorization is subject to the Court's discretion and only upon good cause shown. Bracy v. Gramley, 520 U.S. 899 (1997); Harris v. Nelson, 394 U.S. 286 (1969); Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). The standard for conducting discovery is as follows:

> Rule 6(a) of the Rules Governing Section 2254 Cases requires a habeas petitioner to show good cause before he is afforded an opportunity for discovery. A district court's decision on good cause is reviewed for an abuse of discretion. Good cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief.

Quesinberry v. Taylor, 162 F.3d 273, 279 (4th Cir. 1998) (internal citations omitted) (citing Bravy and Harris).  Discovery is not authorized based on speculation of what the evidence may be.  Hill v. Ozmint, 339 F.3d 187 (4th Cir. 2003).  Here, Petitioner does not demonstrate good cause for the release of this personnel document.  For reasons previously discussed, it was available for use by defense counsel and there is no indication that its release to Petitioner would impact this case.  This Motion will also be denied.

IT IS THEREFORE ORDERED that Petitioner's Motions [Doc. #16, 17, 18] seeking her release on house arrest, an order compelling the North Carolina State Bar to rule on her grievance, and to compel discovery are DENIED.

IT IS RECOMMENDED that Respondent's Motion for Summary Judgment [Doc. #10] be granted, that the Petition [Doc. #1] and Corrected Petition [Doc. #3] be denied, and that this action be dismissed.

This, the 29th day of August, 2017.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge